JOHN McQUEEN and Others v. IRA W. BURHANS and Others.

October 5, 1899.

Nos. 11,617—(161).

### Rescission of Contract—Fraud—Waiver by Delay.

In an action by the vendors to rescind a sale of real estate on account of the fraud of the vendees and of the vendors' own agent, and to compel the vendors to reconvey the property and to account for the proceeds of such of the property as the vendors had sold, *held*, that an unexcused delay by the vendors, after discovery of the facts constituting the fraud, of five years and three months, before rescinding or making any attempt to rescind, amounted, under the circumstances, to a waiver of the right to rescind, and to an implied ratification of the contract, notwithstanding the fraud.

### Same—Ratification.

Mere delay to rescind, after notice or knowledge of the facts constituting the fraud, may be so long or unreasonable as to amount to a ratification.

Action in the district court for Ramsey county to rescind a contract for sale of land and other relief. The case was tried before O. B. Lewis, J., who found in favor of plaintiffs. From an order denying a motion for a new trial, defendants Jefferson and Kasson appealed. From orders denying a motion for a new trial and a motion to amend the decision and findings, defendants Burhans and Nichols appealed. Reversed.

*Warner, Richardson & Lawrence*, for appellants Jefferson and Kasson.

*John B. Sanborn* and *George P. Knowles*, for appellants Burhans and Nichols.

*Frederick G. Ingersoll* and *Asa G. Briggs*, for respondents.

BUCK, J.

A voluminous paper book of 2,073 pages, more than 100 assignments of error, and nearly 600 pages of briefs are submitted in this case for our consideration. As we view the case, the record contains a large mass of matter entirely unnecessary, and has imposed

upon this court a burden seldom if ever before cast upon it.    However, we have patiently and carefully examined the entire record, and the briefs of the respective counsel, and arrived at the conclusion that a new trial should be granted the defendants.    In view of this conclusion, it is proper that we state the grounds thereof.

All parties to the action waived a trial by jury, and the action was tried by the court.    The controversy arose over the sale of certain real property situate in the city of Superior, in the state of Wisconsin, which property these plaintiffs had inherited from one John McQueen, who died in the year 1867, in the state of South Carolina, intestate.    Sarah McQueen, one of these plaintiffs, is the widow of the said deceased, John McQueen, and the other two plaintiffs, who are brothers, are the children of said John McQueen and said Sarah McQueen.    At the time when the transactions in controversy took place, the plaintiffs were residents of the state of Alabama, the defendants Burhans and Nichols resided at the said city of Superior, and the defendant Jefferson and his wife and Kasson resided at the city of St. Paul, in the state of Minnesota.

Jefferson claims to have purchased the real property in controversy of plaintiffs in good faith, for full value.    Burhans claims to have sold a portion of the property, for Jefferson and Kasson, to other parties, for a commission upon the gross amount of the sale, and in an action in the United States circuit court obtained a judgment for such services, which judgment he assigned to the defendant Nichols.    The wife of Jefferson only claims an inchoate interest in the property unsold.    The defendants are all made parties because they claim to have an interest in the property and funds in controversy, or some portions thereof.

On September 19, 1889, and for a long time prior thereto, plaintiffs owned in fee simple certain real property situate in the city of Superior, in the state of Wisconsin; and on said September 19, 1889, they entered into a written contract with Jefferson and Kasson whereby they agreed to convey to them, by warranty deed, said property, for the sum of $15,000 cash, which they did some time in the fore part of October, 1889,—the deed, however, being made to Jefferson.    Subsequently, and between the time of making said deed and June 13, 1891, Jefferson and Kasson sold some 16 pieces of

said real property for $54,750; leaving unsold, and the title now standing in the name of said Jefferson, 8 pieces of said property. which plaintiffs allege to be of the reasonable value of $10,000. The trial court found that the value of the entire property at the time of its sale by plaintiffs to Jefferson and Kasson was not less than $20,-000, and it ordered judgment in favor of plaintiffs, and against Burhans, Jefferson, and Kasson, and each of them, for said sum of $54,-750, less the $15,000 paid, and less $748.73, taxes and assessments paid by Jefferson and Kasson; the sum for which judgment was so ordered being $39,001.27, with interest on the various sums of purchase money for the respective amounts and from the date of the sales of the lots so made by Jefferson and Kasson. The trial court also ordered judgment that the plaintiffs were entitled to recover from the defendants the said real property which was then unsold, and that defendants Rufus C. Jefferson and Genevieve C. Jefferson, his wife, reconvey to plaintiffs the property remaining unsold, and adjudged that none of said defendants had any right, title, interest, lien, or claim in or to or upon the said real property so unsold, or any part thereof.

While Burhans had never received any consideration on the sale of said lots for the said sum of $54,750, he was evidently held individually liable to plaintiffs therefor upon the theory that he, as their agent, fraudulently combined and conspired with Jefferson and Kasson to induce plaintiffs to sell their said property to the latter for much less than it was in fact worth, and that he actually participated in such fraudulent transaction for a valuable consideration paid him by Jefferson and Kasson. The court so found as a fact, viz., that Burhans was the agent and attorney of plaintiffs in negotiating the sale of their said property, and that he falsely and fraudulently represented to and advised them that said property was not then worth more than $15,000, when in fact it was worth not less than $20,000, and that plaintiffs then, in good faith, relying upon Burhans' said representations, conveyed said property to Jefferson. The court also found that, during the negotiations for the sale of said property, Jefferson and Burhans entered into a secret agreement between them whereby Jefferson was to pay or advance $15,000 to buy said property only upon the condition that

Burhans should and would have control of the property and the sale thereof after the purchase of the same from plaintiffs, and should receive 30 per cent. of the net profits of such transaction.

We do not deem it necessary to review the evidence, or pass upon the question of whether it sustains the findings of the trial court as to Burhans' agency and his fraudulent conduct, or whether Jefferson was an innocent purchaser of the property for full value, or fraudulently conspired with Burhans to obtain the property of plaintiffs for less than its reasonable value. Assuming that the findings in these respects are true, the serious question arises whether the plaintiffs were not guilty of such delay and laches after they had notice of the alleged fraudulent agreement of Burhans, Jefferson, and Kasson as to bar them from maintaining this action.

The action is one clearly for rescission of the contract, especially as to the eight unsold lots, alleged by plaintiffs to be of the value of $10,000, the title to which still stands in the name of Jefferson; and it is none the less an action for rescission because the title to some of the lots which have been sold has passed into the hands of other, and probably innocent, persons. While plaintiffs seek to recover the consideration for lots sold by Jefferson, they nevertheless seek to have the deed cancelled so far as it concerns the unsold lots; and asked and obtained from the trial court an order for judgment for such cancellation, and direction that a reconveyance be made to plaintiffs of the said unsold property. Having elected to pursue this remedy, they, of course, are bound by such election. Now, in actions for the rescission of a contract of real estate, based upon the fraudulent conduct of the adverse party, the moving party must do so promptly after receiving notice of such fraudulent acts.

This leads to an examination of the evidence as to the notice which the plaintiffs had of the alleged fraudulent conduct of Burhans, Jefferson, and Kasson, and the time when such notice came to plaintiffs.

But little need be said as to the notice which the plaintiff Joseph P. McQueen, an able and experienced lawyer, had of all the alleged facts as to the fraudulent conduct of Burhans, Jefferson, and Kasson concerning said contract; for the court expressly finds that in November, 1892, he was informed of all thereof. This, it is to be

77 M.—25

noted, was three years and two months after the making of the contract, and five years and three months before the commencement of this action. The evidence fully warrants this finding. The court further found that the other plaintiffs did not have such notice and knowledge, and had no means of ascertaining such facts, at any time prior to December 24, 1896, at which time they did discover them.

Taking up the matter of notice of the fraud to John McQueen, we find that in 1890, and from that time to the date of the trial, he lived at Birmingham, Alabama, and was during such time a practicing attorney, and had been so practicing for many years. It appears that in 1892 some trouble existed between Jefferson and Burhans as to the commission which the latter was to receive upon the sale of the property to third persons which Jefferson had purchased of the plaintiffs, resulting in a lawsuit between them, in which Burhans recovered a judgment against Jefferson and Kasson. A certain attorney, by the name of Shackelford, residing at the city of Superior, came into possession of the facts in regard to the original sale of the property by plaintiffs, and Burhans' sale of the property for Jefferson and Kasson, and his suit against Jefferson and Kasson, and communicated these facts to the plaintiff Joseph P. McQueen in 1892, and then also discussed the matter with John McQueen from half an hour to an hour, when the conversation was cut short by John McQueen's telling Shackelford to go and see McQueen's brother, Joseph P. McQueen, who had charge of the matter and had knowledge of all the facts. Shackelford did as suggested, and discussed all the facts with the brother. Considering that Shackelford's object in seeing the McQueens was to induce them to commence a suit against Burhans for his fraudulent conduct in the matter, his long conversation upon the subject with John McQueen, and his requesting Shackelford to go and see Joseph P. McQueen, who had charge of the matter, leads irresistibly to the conclusion that John McQueen had notice of all the facts of the alleged fraudulent transaction upon which the complaint herein is predicated.

Nor are we fully satisfied but that, under the general rule that parties seeking a rescission of a fully completed contract upon the ground of fraud must act promptly after notice, the other two plain-

tiffs, John William McQueen and Sarah McQueen, should be deemed to have been guilty of laches in their conduct in regard to the matter. It is conceded by plaintiffs' counsel, and found by the court, that in December, 1896, they did have notice of the fraudulent conduct of Burhans, Jefferson, and Kasson; and this suit was not commenced until June 23, 1897, six months after discovering the fraud. The rule seems to be universal that the party defrauded must act with great punctuality and promptness, and cannot be permitted to select his own time and convenience in exercising his right of rescission, and pursue a course which enables him to retain or recover the property if the markets should prove favorable, but, if the property greatly decreased in value, not rescind at all, and thus play fast and loose, and speculate upon an alleged fraudulent contract. "In such a case the mere fact that it does not appear that the other party has changed his position to his prejudice will not defeat the defense of laches."

Pomeroy, in his work on Equity Jurisprudence (volume 2, § 897), in discussing this question, says:

"All these considerations as to the nature of misrepresentations require great punctuality and promptness of action by the deceived party upon his discovery of the fraud. The person who has been misled is required, as soon as he learns the truth, with all reasonable diligence to disaffirm the contract, or abandon the transaction, and give the other party an opportunity of rescinding it, and of restoring both of them to their original position. He is not allowed to go on and derive all possible benefits from the transaction, and then claim to be relieved from his own obligations by a rescission or a refusal to perform on his part. If, after discovering the untruth of the representations, he conducts himself with reference to the transaction as though it were still subsisting and binding, he thereby waives all benefit of and relief from the misrepresentations."

Probably there are no adjudicated cases which clearly and fully define just what is meant by the term "promptness." A variety of circumstances may control in determining whether a party had acted with punctuality and promptness in rescinding a contract after notice of the fraud. One case might call for great promptness, while in another longer delay might be justifiable, but we think that the tendency of the courts at the present time is to hold

that the deceived party must act with greater promptness than formerly. A reasonable time, and no more, should be permitted after notice. An opportunity for investigating all the facts and to prepare the necessary papers for the commencement of an action for rescission would seem reasonable.

But in this case Joseph P. McQueen and John McQueen, two of the plaintiffs, and themselves experienced attorneys, had full notice of the facts in 1892, and the mother, Sarah McQueen, then lived with the latter, and until the trial of this action, and at a time when she discovered all the facts constituting this fraud; and it is not easy to conceive of a case where a better opportunity existed for promptly commencing an action for rescission than in this case of Sarah McQueen. It may be that the evidence does not show conclusively that she had notice of the fraud prior to December 24, 1897, although we think that there was ample evidence to infer that she did have such notice long prior to that date. Nor was the position of James W. McQueen such as to require delay in the investigation of facts necessary for him promptly to commence an action for rescission upon the ground of fraud. Two of his brothers, practicing attorneys, joint plaintiffs with him herein, knew all the facts as to the fraud, and could readily have communicated to him everything necessary for prompt action upon his part, and delay was unnecessary. John McQueen and James W. McQueen lived at the same place, and we find no reasonable excuse why this suit was not commenced sooner. The evidence is well-nigh conclusive that James W. McQueen and Sarah McQueen were also guilty of such laches as to bar them from maintaining this action.

The following cases illustrate the tendency of modern courts to hold parties to great punctuality and promptness in moving to repudiate in cases of fraudulent contract, after notice of the fraud:

In Wheeler v. Robinson, 86 Hun, 561, 33 N. Y. Supp. 921, it was held that it is the duty of a grantee, if he desires to repudiate a conveyance of property to him, and the giving of a mortgage by him to secure the purchase price thereof, on account of the false representations of the grantor, to do so as soon as the fraud is discovered by him.

In the case of Byrd v. Rautman (decided April 1, 1897) 85 Md. 414,

36 Atl. 1099, it was held that a party who seeks to have an executed contract rescinded on the ground of fraud must be guilty of no unnecessary delay, and that a bill filed for such purpose more than three years after the contract was made, and a year after plaintiff acquired full knowledge of all the facts, will be dismissed because not filed within a reasonable time, and that the party must elect to repudiate the contract at once upon the discovery of the fraud, and be guilty of no unnecessary delay in coming into a court of equity for relief; citing Wenstrom v. Purnell, 75 Md. 113, 120, 23 Atl. 134.

In the case of Hallahan v. Webber (Sup.; decided June 29, 1896) 7 App. Div. 122, 40 N. Y. Supp. 103, it was held that the right of a seller to rescind on the ground that she was induced to make the sale by false representations of the buyer is waived by delay in waiting from April 9, 1894, when she became aware of the fraud, until July 10, 1894, before she commenced the action. It is true that this was a case relating to the sale of goods, but it is supported by the court citing Hammond v. Pennock, 61 N. Y. 145, and Schiffer v. Dietz, 83 N. Y. 300, which were cases relating to fraudulent rescissions of sales of real estate.

In so far as the doctrine of laches is applicable to any of these plaintiffs, it must be noted that the case is an exceptional one,—rendered so by the speculative character of the property sold by them in 1889, during what was known as "boom times," and subject to great contingencies. That the property, as to price and value, was precarious and speculative, is fully evidenced by the finding of the trial court as to its value of $20,000, and its subsequent sale in part within a year or so for a large sum, while one-third remains unsold. And the evidence generally upon this point shows clearly its speculative character at that time. Now, it was said in Williams v. Rhodes, 81 Ill. 571, and in Connely v. Rue, 148 Ill. 207, 35 N. E. 824, that a delay which might have been of no consequence in an ordinary case may be amply sufficient to bar the title to relief where the property is of a speculative character or is subject to contingencies, or where the rights or liabilities of others have in the meantime been varied. If the property is of a speculative or precarious nature, it is the duty of the party complaining of the fraud to put forward his complaint at the earliest possible time. He cannot be

allowed to remain passive, prepared to affirm the transaction if the concern should prosper, or to repudiate it if that should prove to his advantage. Kerr, F. & M. (Bump Ed.) 306, 307.

But there is another phase of this case which should not be overlooked or disregarded. A new trial must be granted as to Joseph P. McQueen and John McQueen, should a new trial be granted as to the other plaintiffs.

The suit is an equitable one, and the court has jurisdiction of all the parties and the subject-matter. All parties plaintiff voluntarily brought the action jointly. They seek to recover a joint fund, and have a joint rescission of a joint contract in regard to the sale of real estate. Upon the trial they all insisted and have continually insisted, that the doctrine of laches was not applicable to any one of the plaintiffs, nor to all of them, while the defendants insist upon a contrary doctrine. The trial court found that Joseph P. McQueen more than five years before the commencement of this action had notice of all the facts constituting the fraud, but made no findings as to his laches, and disregarded this question as to all of the plaintiffs. This question, vital as to all parties, seems to have been ignored by the trial court, and the case was tried upon the sole theory that fraud only was involved.

There is no doubt but that the plaintiffs were proper parties, for they all had a common right and interest in the real property which they had jointly conveyed away, and in the contract which they now seek to have rescinded as to the unsold property. They also have a common and joint interest in the fund which they claim was received on the sale of part of the lots. That fund they seek to recover, and that their community interest therein be determined. If upon a new trial one or more of the plaintiffs recover and the others are defeated, it will be the duty of the court to divide the fund by its decree, and make a proper division thereof, and properly apportion the costs and disbursements, and make and pass upon the question of the allowance of the sums paid by the defendants as taxes and assessments. How far this sole theory upon which the trial court proceeded may have affected the entire result, as against the defendants, it is difficult, if not impossible, to discover. The question of laches was a pivotal point as to the defendants, as was the ques-

tion of fraud to all parties. Trying a case and basing the result upon one theory alone, when other vital issues are involved, but utterly ignored, may be, and we think in this case was, judicial error, for which, under all the facts, a new trial should be granted as to all parties, and upon all the legitimate issues. As a new trial is ordered as to Burhans, Jefferson, and Kasson, it follows, as a matter of course, that the same order should be and is made as to the defendant Nichols.

The order of the trial court denying the defendants' motion for a new trial is reversed.

MITCHELL, J.

In concurring in the result arrived at in the foregoing opinion, I wish to state briefly the grounds upon which I have arrived at this conclusion.

While in one sense this action is one to enforce a constructive trust, yet it is essentially an action by a vendor to rescind a sale on the ground of the joint fraud of the vendee and of the vendor's own agent. The rights of the plaintiffs, if any, all depend upon and grow out of the right of rescission, hence the action is controlled by the rules of law applicable to the subject of the right of the rescission of contracts on the ground of fraud. The distinction must be kept in mind between an action for damages and one for rescission. The property (a number of lots in Old Superior) had for many years remained unimproved, unproductive, and virtually unsalable. Its value was wholly speculative and prospective. The sudden and wild "boom" which enabled Jefferson and Kasson in less than two years to sell the larger part of the property for so great an advance over what they paid for it had not yet arrived, although some things then existed which men might or might not (according to their past experience or natural temperaments) have considered signs of a coming "boom." Burhans' statement as to the value of the property was made before Jefferson and Kasson appeared on the scene, and, so far as appears, before they were thought of as possible purchasers of the property. Under such circumstances, I very much doubt whether there is any evidence to justify the court in finding that Burhans' statement as to value was fraudulent, or anything but an honest expression of opinion.

It seems to me, therefore, that for their right to rescind the plaintiffs have to stand upon the propositions—First, that the relations of trust and confidence between them and Burhans, as their agent, were such that his taking an interest in the purchase without their knowledge was a constructive fraud upon them; and, second, that Jefferson and Kasson had knowledge of facts sufficient at least to put them upon inquiry as to the relations between plaintiffs and Burhans, and hence that they were chargeable with notice of the fraud. I assume, without discussion, that the evidence was sufficient to justify the court in finding in favor of the plaintiffs on both these propositions. The finding of the court, supported by conclusive evidence, is that the plaintiff James P. McQueen had notice of all the facts constituting the fraud as early as November, 1892. In my opinion, notwithstanding the finding of the court to the contrary, the evidence was also conclusive that the plaintiff John McQueen had the same notice at the same date. At this time the sale was already over three years old. No claim was asserted, or any notice given that any would be asserted, against the defendants for some four years, and no suit was brought to rescind, until over five years after these two plaintiffs obtained knowledge of the facts. Neither was any excuse for nor explanation of this delay given. I think this amounted to a waiver of the right to rescind, and to an implied ratification of the sale notwithstanding the fraud.

The contention of the plaintiffs is, in substance, that, where there has been no affirmative act of ratification of a contract voidable on the ground of fraud, no mere delay, however long, short of the statute of limitations, will amount to a ratification or a waiver of the right of rescission, unless the other party has in the meantime, by reason of the delay, been misled, or has changed his position to his prejudice. And it is urged that in this case the plaintiffs have never affirmatively ratified the sale since their discovery of the facts, and that the defendants have in no way changed their position since such discovery in November, 1892. I do not think that either principle or the weight of authority will justify so broad a statement of the law.

The courts have always refused to lay down any hard and fast rule on the subject, but have left each case to be determined largely

upon its own particular facts. In treating of the subject of the rescission of voidable contracts, they have usually laid down the reasonable rule that a party must rescind, or at least give notice of his intention to do so, within a reasonable time after discovery of the facts giving the right to rescind. And, in my opinion, under many circumstances there may be and are cases where mere delay and silence after discovery of the facts may be so long and unreasonable as to amount to an implied election to waive the right to rescind and to ratify the contract. Acts of omission frequently speak as loudly as those of commission. This, I think, is just such a case, at least as to the plaintiffs James P. and John McQueen (themselves experienced lawyers), especially considering the speculative and fluctuating value of the property which was the subject of the contract. And who can say that Jefferson and Kasson have not been prejudiced in more ways than one by the delay? It at least appears that in the meantime they have been engaged in protracted litigation with Burhans as to the amount of his share in the proceeds of the property, which has resulted in a large judgment against them.

It follows that defendants are entitled to a new trial, at least as to two of the plaintiffs. Without considering the evidence as to the other two, I think, for reasons suggested in the opinion, the proper disposition of this appeal is to grant a new trial of the whole case as to all of the plaintiffs.

CANTY, J.

I concur with Justice MITCHELL.